IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRADLEY DEON HOOVER,<br><br>                     Petitioner,<br><br>vs.<br><br>SCOTT FRAUENHEIM, Warden,<br>Pleasant Valley State Prison,<br><br>                     Respondent. | No. 2:15-cv-00082-JKS<br><br>MEMORANDUM DECISION |

Bradley Deon Hoover, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Hoover is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Pleasant Valley State Prison. Respondent has answered, and Hoover has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

In 1994, victim Michael Augustin was kidnapped and killed. Hoover, along with co-defendant Andrea Marie Carvalho, was initially charged with the crimes by felony complaint filed on November 1, 1994. At that time, Hoover was incarcerated on an unrelated crime, and was subsequently convicted and sentenced to prison on the other case. It was not until 2011, 17 years after the initial felony complaint was filed, that Hoover proceeded to a jury trial on the kidnapping and murder charges. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying the charges against Hoover and the procedural history of his case:

*[Hoover's] Charging and Prosecution*

*1994–1995*

The kidnapping and murder were alleged to have occurred in Sacramento County on August 8, 1994, but [Hoover] was not immediately charged. He was under investigation for an unrelated crime in Solano County as of March 1994 and was arrested in that case on October 20, 1994.

On November 1, 1994, the People filed a felony complaint against [Hoover] and Andrea Marie Carvalho,[FN2] accusing both of the murder and kidnapping of victim Michael Agustin. Carvalho's preliminary hearing, held in December 1994, ended in dismissal, with the magistrate finding insufficient evidence on all counts.[FN3] [Hoover] was not arraigned on the complaint as his Solano County case was ongoing; he was subsequently prosecuted, convicted, and sentenced to prison in the Solano County case.

> FN2. Carvalho later married [Hoover].
>
> FN3. As we discuss post, a transcript of Carvalho's preliminary hearing was not available at [Hoover's] trial.

On December 5, 1995, the Sacramento County Sheriff's Department filed a detainer against [Hoover], notifying him of the present case and his right to request its disposition under section 1381.[FN4]

> FN4. Section 1381 provides in pertinent part that a defendant serving a prison sentence, if charged in any other pending criminal proceeding, must be brought to trial within 90 days after the defendant requests trial in writing.

*2011*

On January 7, 2011, [Hoover] filed a demand for trial in the present case. On January 28, 2011, the District Attorney's investigator interviewed [Hoover] in prison. [Hoover] told the investigator this case had had "no bearing on [him] whatsoever for the last 16 years[,]" but he had filed his request for trial now because he wanted to get a job in prison and the hold on him from this case prevented it.

On February 7, 2011, the court arraigned [Hoover] on the original complaint; three days later, the People filed an amended complaint, naming only [Hoover]. He entered a plea of not guilty. On March 1, 2011, the trial court held [Hoover] to answer on the amended complaint, then deemed it an information.

The People thereafter dismissed the original case and rearrested [Hoover] on March 29, 2011. [Hoover] waived preliminary hearing. On April 22, 2011, the People filed a new information, case No. 11F02341.

*[Hoover's] Motion to Dismiss*

On June 16, 2011, [Hoover] filed a "motion to dismiss or for other sanctions due to dilatory prosecution." He argued that the People violated his speedy trial rights under the California Constitution because the 17–year delay in bringing the case to trial had

2

prejudiced him by hindering his ability to prepare his defense. As evidence, he cited (1) his inability to recall the facts surrounding the alleged crimes; (2) the alleged destruction of the preliminary hearing transcript in Carvalho's case; (3) the disappearance of witness John Wagner, who was never interviewed by defense counsel; (4) the lack of any further investigation of the case since defendant's arrest in 1994 on the Solano County case; and (5) the unavailability of witness Terry Walling.

*Opposition*

The People opposed the motion, arguing that because, aside from Wagner and Walling (whose unavailability benefitted [Hoover]), all material witnesses had been located and subpoenaed, and all material physical evidence had been preserved, [Hoover] had not shown actual prejudice under the California Constitution.[FN5]

> FN5. On appeal, [Hoover] agrees that his Sixth Amendment (federal) speedy trial right is not at issue as it was not triggered until the filing of the information in case No. 11F02341. (*See, e.g.*, *People v. Martinez* (2000) 22 Cal. 4th 750, 756 (*Martinez*).)

*[Hoover's] Response*

[Hoover] cited the following as further evidence of prejudice: (1) Wagner's mother informed the police in November 2009 that around the time Wagner disappeared, a cousin named Sam Kissell had threatened to kill him over a drug debt; the police had done nothing to follow up on this information, which might bear on Wagner's credibility.[FN6] (2) The police and the District Attorney's investigator had only just interviewed Dale Allbright, whose motorcycle broke down near the Rio Vista Bridge around 2:00 a.m. on August 9, 1994, and who was picked up by an unidentified male in the only car Allbright had seen on the road that evening. Timely investigation of his story might have revealed that the unidentified male murdered the victim, or led to the discovery that someone else other than [Hoover] did so.[FN7] (3) All police dispatch records from the night of the crime had been destroyed or purged due to the passage of time.

> FN6. Wagner's mother testified that she had actually told the police about this near the time of Wagner's disappearance.

> FN7. Allbright testified at trial. He could not say precisely where his motorcycle broke down or where the unknown driver (whom he described only as "a white guy") picked him up. He did not see police cars or helicopters that night.

*The Trial Court's Pretrial Ruling*

The trial court ruled tentatively in limine that [Hoover] had shown "some evidence of actual prejudice" from the delay in prosecution, based on the lack of a transcript of Carvalho's preliminary hearing and the destruction of the police dispatch

3

logs.^FN8 The court did not mention any other item cited in defendant's briefing. It indicated it did not find defendant's claim of faded memory persuasive as to prejudice, but that it might instruct the jury on faded memories and missing witnesses if the evidence proved to warrant such instruction.

> FN8. Defense counsel declared that, according to the Sacramento Court Reporter's Office, the transcript had been destroyed. The prosecutor, who had also represented the People at the preliminary hearing in 1994, declared that at the hearing Carvalho's defense attorney had argued Carvalho was merely present at the crime scene. He added that it was the policy of the Sacramento County Superior Court (in 1994 and continuing) not to prepare transcripts of preliminary hearings in cases where defendants were not held to answer unless a party so requested.
>
> Defense counsel asserted that Carvalho had told him that at her preliminary hearing the story told by [Hoover's] accusers, as presented by the investigating officer pursuant to Proposition 115, was impeached. The prosecutor replied that, as stated in his declaration, the magistrate had not held Carvalho to answer due to the absence of proof that she had any control over the situation leading to the murder, rather than because the accusation against [Hoover] was credibly challenged.

Having found prejudice from the delay in prosecution, the trial court asked the prosecutor to justify the delay. The court said it thought the People might have been hoping witness Wagner would "resurface." The prosecutor agreed: "That is the reason." The trial court denied [Hoover's] motion to dismiss, but left open the option to revisit the issue of "faded memories" if warranted based on the evidence presented at trial.

*Trial Evidence*

On August 8, 1994, at 10:48 p.m., officers dispatched to a rural location near Rio Vista for a reported pedestrian-vehicle accident found victim Agustin, fatally shot in the head. Agustin had been shot first at one location, then again at another location about 200 yards away, by a single firearm.^FN9

> FN9. The officers did not disclose to the media or the victim's family how many times Agustin was shot or at how many locations.

On the morning of August 8, 1994, Agustin visited his sister, Cynthia Hylton, at her home in Vallejo. She knew he was "involved in the drug scene" and hung out at Terry Walling's house. He did not have a job or a regular place to live. He had become increasingly fearful and paranoid in the last few months. He arrived on a new motorcycle (which he did not have the money to buy, as far as she knew) and put it in her garage; he also had a gun. He telephoned someone on her home phone, yelling, "Hey, I told you not

4

to tell" or "Why did you tell him?" He borrowed her car for a short time, returned it, and left again.

Alfredo Ramirez, Agustin's nephew, saw Agustin on the afternoon of August 8, 1994.[FN10] Ramirez had recently observed changes in Agustin's behavior that he perceived to be related to methamphetamine use. Agustin called Ramirez from Hylton's home, asking for a ride in his car. Ramirez took him to get money from someone, then drove him to Walling's house and dropped him off around 3:00 or 4:00 p.m. He did not see Agustin alive after that.

> FN10. The two men were six years apart in age and were like brothers

Terri Hussey, [Hoover's] friend, was at Walling's house, described as a "gathering place for people," when Agustin arrived. She had seen him there before, but did not know him well.

Later, [Hoover] came to the house. After that, John Wagner (a drug user who was down on his luck and living on the streets) arrived, but tried to leave when he saw [Hoover]. [Hoover] said he needed to talk to Wagner and told him to sit down.

[Hoover] said something had happened that he needed to talk about with Agustin. A "meeting" ensued, involving [Hoover], Wagner, and Agustin, among others. [Hoover] was the dominant person in the conversation.

"[T]earing up," Agustin said to Walling: "[P]lease don't let him take me. I don't want to go. Help me." [Hoover], Wagner, and Agustin walked out of the house; [Hoover] told Agustin not to make a scene and to "act like it was a casual walk across the street." Several people were outside, including Carvalho.

As [Hoover] was leaving, Hussey said to him: "I don't know what's going on here, but is it as bad as what Don had did [sic ][?]"[FN11] [Hoover] said it was worse. Hussey said she did not want to know any more and went inside. After Wagner came to the house and as he was leaving, Hussey saw a red convertible Chrysler LeBaron parked outside. Wagner had borrowed a red convertible Chrysler LeBaron from his friend in August 1994 and failed to return it. It was later recovered, inoperable, in Rio Vista.

> FN11. Don Riley testified that [Hoover] had beaten and humiliated him because he received a tattoo from someone [Hoover] disliked.

The next day, police officers came to the house. Hussey and the others there denied any knowledge of what had happened to Agustin. Subsequently, Hussey had a conversation with Patti Brown, at whose home she was staying. According to Hussey, Brown said Carvalho, seeming "scared" and "frantic," had told Brown that she and [Hoover] "took [Agustin] to Yolo County out in the slough, something like that. They shot him. He was shot once in the head or something, and then they drove off and then had a funny feeling and turned around and came back and he had drug [sic ] himself up into the street and they shot him again."[FN12]

5

FN12. Brown testified that she never made any such statement to Hussey or heard any such statement from Carvalho. Carvalho testified that she never made any such statement to Brown.

On or around August 18, 1994, Walling was arrested for a probation violation and held in custody in Fairfield. On August 25, 1994, Hussey called Detective Richard Lauthier, the lead investigator on the case, and said she wanted to make a statement. She went to the place where Walling was being held and spoke privately with him. Thereafter, they made a joint videotaped statement in which Hussey recounted the story she had heard from Brown.[FN13] On October 20, 1994, Lauthier interviewed Hussey alone. She re-told the story she had heard from Brown.

FN13. Walling told the police that John Wagner had said he was in a car driven to the murder scene on August 8, 1994, by Carvalho, and was dropped off somewhere near the scene after the killing. Walling was unavailable at trial.

The portion of the videotape including the statements was not played for the jury (possibly because the sound quality was "terrible"). However, the first portion of the videotape, in which Hussey and Walling were alone together and very affectionate toward each other, was played without sound for the jury as a defense exhibit to impeach Hussey's testimony that she and Walling were "just friends."

On October 29, 1994, Detective Lauthier interviewed Wagner. On November 1, 1994, Wagner's mother, who knew he had been involved in the drug scene, saw him at a Motel 6 in Fairfield; he seemed scared, but sober. She never saw him again. On December 16, 1994, Wagner's father filed a missing persons report naming him. Wagner's mother notified the police around that time that Wagner had been involved in a dispute with a relative.

District Attorney's investigator Ron Garverick testified that he had tried to determine Wagner's whereabouts, but no information subsequent to the missing persons report had turned up to indicate that Wagner might still be alive. He also tried to find Walling, who had left the state, but was unsuccessful.

Carvalho testified under a grant of immunity. She denied that she or [Hoover] had anything to do with the death of Agustin. She claimed that on the day of the crime they were eating dinner with her parents (now deceased).

[Hoover] did not present any evidence.

*Renewed Request for Dismissal and Instruction*
After the People rested, defense counsel raised the following observations from trial as further proof of prejudice from the delay and renewed his request for dismissal: (1) An officer who responded to the dispatch on the night of the crime testified that he could not remember to whom he had spoken at the Rio Vista Police Department, or

whether it was that department or the California Highway Patrol who had dispatched him. (2) Telephone records showing with whom the victim spoke when he called from Cynthia Hylton's home on August 8, 1994, were no longer available. (3) It was no longer possible to track down the person from whom the victim borrowed money on that date. (4) Carvalho's parents, who might have been able to corroborate [Hoover's] alibi, were now dead, and no one had ever taken statements from them.

    The trial court did not explicitly rule on the renewed request for dismissal, but indicated that it would inform the jury regarding the lack of a transcript.

    Ultimately, the trial court instructed the jury:

> "You have heard testimony in this case concerning the government's failure to preserve certain evidence. The failure of the government to preserve this evidence may be relevant to the issues presented by this case. In evaluating the credibility and weight of the evidence, you may consider the government's failure to preserve certain evidence, specifically the preliminary hearing transcript of People versus Andrea Carvalho, December 8, 1994, and the dispatch record of various government agencies to the scene of the incident which is the subject of this case, the discovery of the body of Michael Agustin. [¶] From the fact that the government did fail to preserve such evidence, you may draw an adverse inference against the government, which may leave you with a reasonable doubt as to [Hoover's] guilt. It is for you to determine whether to draw an adverse inference from the government's failure to preserve evidence. It is also for you to decide the weight, if any, to be given to the government's failure to preserve such evidence."

*People v. Hoover*, No. C069060, 2013 WL 3938506, at *1-5 (Cal. Ct. App. July 29, 2013).

At the conclusion of trial, the jury found Hoover guilty of first-degree murder as charged in Count 1 and guilty of kidnapping as charged in Count 2. The jury also found that Hoover committed murder while engaged in the commission of kidnapping, an enhancement attached to Count 1.[1] The trial court subsequently found Hoover ineligible for probation and sentenced him to life imprisonment without the possibility of parole for the murder and accompanying

---

[1] The 2011 indictment had also alleged as to Counts 1 and 2 that Hoover personally used a firearm during the commission of the charged crimes, but the jury could not reach a decision on the firearm allegations, and the prosecutor dismissed them.

kidnapping enhancement. The trial court also imposed a 5-year imprisonment term for the kidnapping, which was stayed under California Penal Code § 654.[2]

Through counsel, Hoover appealed his conviction, arguing that: 1) the 17-year delay in prosecuting Hoover deprived him of his rights to due process and a fair trial; and 2) the booking and jail classification fees were unauthorized because there was no evidence that Hoover had the ability to pay. The Court of Appeal unanimously affirmed the judgment against Hoover in a reasoned, unpublished decision issued on July 29, 2013. *Hoover*, 2013 WL 3938506, at *8. Hoover petitioned for review of his untimely prosecution claim, and the California Supreme Court summarily denied the petition on October 16, 2013.

Hoover then filed a *pro se* motion for habeas relief in the Superior Court, arguing that the denial of his motion to dismiss for delayed prosecution resulted in his representation being "constructively" ineffective. The Superior Court issued a reasoned, unpublished opinion denying the petition after determining the claim should have been, but was not, raised on direct appeal, and was alternatively without merit. Hoover also raised his constructive denial of counsel claim in *pro se* habeas petitions in the Court of Appeal and Supreme Court, which were denied without comment on December 30, 2014, and May 13, 2015, respectively.

Hoover then timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on January 5, 2015. *See* 28 U.S.C. § 2244(d)(1)(A).

---

[2] Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." CAL. PENAL CODE § 654.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Hoover raises two claims for relief. First, he argues that the 17-year delay in prosecution deprived him of due process and a fair trial. He relatedly argues in Ground 2 that the prosecutorial delay resulted in a constructive denial of counsel.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

9

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Both of Hoover's claims arise from the 17-year delay from the time Hoover was initially charged with the crimes by felony complaint to his trial and conviction, which the Court acknowledges is an extraordinary delay. Hoover claims that: 1) the delay deprived him of due

10

process and a fair trial in violation of the Fourteenth Amendment; and 2) the delay constituted the constructive denial of counsel in violation of the Sixth Amendment.

It is worth noting that Hoover did not raise on direct appeal, and does not allege here, that the delay violated his right to a speedy trial under the Sixth Amendment. *Doggett v. United States*, 505 U.S. 647, 651 (1991) (explaining that a court should assess four factors in determining whether the Sixth Amendment right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted the right; and (4) whether the defendant suffered prejudice as a result of the delay); *Barker v. Wingo*, 407 U.S. 514, 530 (1972). In his direct appeal, Hoover acknowledged that the indictment that was the basis for his conviction (Case No. 11F02341) was issued in April 2011,[3] and he proceeded to a jury trial in June 2011. The delay therefore occurred between the murder and the indictment.[4]

---

[3] As a general rule, in California, an order dismissing an action for violation of the speedy trial statute is a bar to further prosecution for the same offense if it is a misdemeanor, but not if it is a felony or a misdemeanor joined with a felony. 5 WITKIN, CALIFORNIA CRIMINAL LAW, Criminal Trials § 327 (3d ed.2000). Therefore, a new felony action may ordinarily be instituted after the dismissal and within the period of the statute of limitations. The California Supreme Court has explained:

> Section 1387 provides that an order of dismissal of a criminal charge is not "a bar to any other prosecution for the same offense . . . if it is a felony." Included in such orders of dismissal are those granted by reason of the fact that the defendant was not brought to trial within statutory time limits. Although the right to a speedy trial is grounded in both the United States and California Constitutions, the timely refiling of charges once dismissed for denial of a speedy trial has been deemed constitutionally permissible absent a showing by the accused of actual prejudice.

*Crockett v. Superior Court*, 535 P.2d 321, 324 (Cal. 1975).

[4] Moreover, Hoover properly received notice in December 1995, while in state custody on the unrelated charges, that he could request disposition of the murder charges under California Penal Code § 1381, and the State would be required to bring Hoover to trial on those charges within 90 days of the request. Hoover did not make such request until January 2011.

The Supreme Court holds that "when no indictment is outstanding, only the 'actual restraints imposed by arrest and holding to answer a criminal charge . . . engage the protections of the speedy trial provision of the Sixth Amendment.'" *United States v. Loud Hawk*, 474 U.S. 302, 311 (1986) (quotation omitted). When the actual restraints are removed and "defendants are not incarcerated or subjected to other substantial restrictions on their liberty, a court should not weight that time towards a claim under the Speedy Trial Clause." *Id.* at 312. Here, Hoover was neither under indictment or held in custody on the murder charges[5] during the relevant time period from November 1994 through 2010. Although a felony complaint was initially filed against Hoover in November 1994, "the Supreme Court has not decided whether the filing of a felony complaint is sufficiently analogous to an indictment or information to trigger the protections of the Sixth Amendment Speedy Trial Clause." *Mann v. Beard*, 649 F. App'x 392, 393 (9th Cir. 2016).[6] As the Ninth Circuit Court of Appeals has recognized, the circuit is split on whether the filing of a felony complaint triggers the right. *Id.* (citing cases). Because the

---

While a court cannot infer acquiescence to delay from a defendant's silence alone, *Barker*, 407 U.S. at 525-26 & n.4 (waiver is an "intentional abandonment of a known right or privilege" and, therefore, cannot be presumed from a silent record), the Supreme Court has suggested that a defendant's failure to request quick adjudication may be taken as "some indication" that the defendant did not desire a speedy resolution of the charges against him, *see United States v. Eight Thousand Eight Hundred and Fifty Dollars in U.S. Currency*, 461 U.S. 555, 569 (1983). The Supreme Court has also acknowledged that, although a prosecutor's delay may prejudice a defendant, a defendant may choose to take advantage of the delay for tactical reasons. *See Barker*, 407 U.S. at 521 ("As the time between the commission of the crime and trial lengthens, witnesses may become unavailable or their memories may fade. If the witnesses support the prosecution, its case will be weakened, sometimes seriously so.").

[5] Although he was in custody at that time on another conviction, he was not restrained on the murder charges.

[6] Cited for its persuasive but non-precedential value. FED. R. APP. P. 32.1.

Supreme Court has not answered the question in the affirmative, there exists no clearly established Federal law on such right that would entitle Hoover to habeas relief.

Indeed, the Supreme Court has observed that the applicable statute of limitations is the "primary guarantee against bringing overly stale criminal charges." *See United States v. Marion*, 404 U.S. 307, 322, 324 (1971) (quoting *United States v. Ewell*, 383 U.S. 116, 122 (1966)). The Supreme Court has acknowledged, however, that the statute of limitations does not fully define a defendant's rights. It has therefore found that the Fifth Amendment may, in some circumstances, require dismissal of a prosecution based on pre-indictment delay, even where the prosecution was brought within the applicable limitations period. *Id.* at 324, 326 (finding due process right but nonetheless holding that the defendant failed to establish a due process violation because "[n]o actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them"). Hoover therefore correctly raises his claim under the Fourteenth Amendment.

In *United States v. Lovasco*, 431 U.S. 7836, 790 (1977), the Supreme Court stated that in due process claims of pre-indictment delay, "proof of prejudice is generally a necessary but not sufficient element of a due process claim, and that the due process inquiry must consider the reasons for the delay as well as the prejudice to the accused." Where the reason for the delayed prosecution is "investigative delay," a criminal defendant's due process rights are not necessarily violated "even if his defense might have been somewhat prejudiced by the lapse of time." *See id.* at 796. However, the Supreme Court in *Lovasco* declined to set out a balancing test for

13

determining when pre-indictment delay violates due process,[7] and instead left it "to the lower courts, in the first instance, the task of applying the settled principles of due process that we have discussed to the particular circumstances of individual cases." *See id.* at 796–97.

To prevail on a due process claim based on pre-indictment delay, the Court of Appeals for the Ninth Circuit has held that a defendant must first show "actual, non-speculative prejudice from the delay." *United States v. Corona-Verbera*, 509 F.3d 1105, 1112 (9th Cir. 2007). Showing actual prejudice is a "'heavy burden' that is rarely met." *Id.* (quoting *United States v. Huntley*, 976 F.2d 1287, 1290 (9th Cir. 1992)). "Generalized assertions of the loss of memory, witnesses, or evidence are insufficient to establish actual prejudice. Consequently, [a defendant] must show both that lost testimony, witnesses, or evidence meaningfully has impaired his ability to defend himself, and [t]he proof must demonstrate by definite and non-speculative evidence how the loss of a witness or evidence is prejudicial to [his] case." *Id.* (internal quotation marks and citations omitted). Once the defendant shows actual prejudice, he must next show that this prejudice outweighs the reasons for the delay, and the delay "offends those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.'" *Id.* (quoting *United States v. Sherlock*, 962 F.2d 1349, 1353-54 (9th Cir. 1989)).

Here, the record reveals that the trial court employed a full inquiry into Hoover's contentions of prejudice in considering his motion to dismiss, and the Court of Appeal subsequently examined in detail every basis upon which Hoover claimed prejudice. The Court

---

[7] The Ninth Circuit has recognized that the Supreme Court has never clearly established a definitive test for evaluating due process claims premised on pre-indictment delay, for purposes of federal habeas claims under 28 U.S.C. § 2254(d)(1). *See Shammam v. Paramo*, 664 F. App'x 629, 631 (9th Cir. 2016); *New v. Uribe*, 532 F. App'x 743, 744 (9th Cir. 2013); *Reed v. Schriro*, 290 F. App'x 982, 985 (9th Cir. 2008).

of Appeal thoroughly described that review in its reasoned opinion rejecting Hoover's due process claim after it disagreed with the trial court's finding of prejudice:

> **1. Pretrial Ruling**
> Here, the trial court found [Hoover] had shown actual prejudice from the 17–year delay in prosecution based on the lack of a transcript from Carvalho's preliminary hearing and the destruction of police dispatch logs from the date of the crime. The absence of these items at trial does not support a finding of prejudice.[FN14]
>
>> FN14. Although [Hoover] argues that we were asked by the People to "re-decide an issue of fact" by claiming that defendant failed to show prejudice, we disagree and construe the People's argument that "the delay did not prejudice [Hoover]" as an integral part of the People's argument that the trial court correctly denied [Hoover's] motion to dismiss.
>
> First, the record does not show that the lack of a transcript from Carvalho's preliminary hearing is attributable to the delay in prosecution. The People declared that preliminary hearings where defendants were not held to answer were not transcribed unless a party requested it. [Hoover's] claim that a transcript once existed but was destroyed was based only on a hearsay assertion by a person who did not testify or submit a declaration on the motion to dismiss, as we explained at footnote 8, *ante*.
> Even were we to assume a transcript did exist at one time, its absence at trial did not translate into a finding that the delay in prosecuting [Hoover] *prejudiced* him. The People's failure to show probable cause to hold *Carvalho* over had no apparent tendency to exculpate [Hoover]. Although [Hoover] asserted that Carvalho had somehow impeached the version of events told by his accusers, he presented no evidence in support of the assertion. Nor did he explain how the accusers' version had been impeached, or why it was more difficult to impeach that story in 2011 than in 1994. In short, the absence of a preliminary hearing transcript in Carvalho's case did not establish that the delay in prosecution prejudiced [Hoover].
> Similarly, the destruction of the police dispatch logs did not establish prejudice. The police reports from 1994 were preserved, and the officers who initially investigated the crime testified regarding the details of their dispatch to the crime scene. The record is devoid of an explanation for how the missing dispatch logs could have even speculatively impeached the officers' testimony regarding the details of their dispatch to the murder scene, or how that testimony was even relevant to the larger question of [Hoover's] culpability for the murder.
> Further, we see no facts available to the trial court that it could have properly cited to support a finding of prejudice. The fact that two of the three key witnesses against [Hoover] (Wagner and Walling) were unavailable for [Hoover's] trial in 2011 forced the People to rely entirely on the double-hearsay account of Terri Hussey, whose credibility was suspect. The trial court properly discounted [Hoover's] self-serving claim that his own memory had faded. Finally, [Hoover's] speculations about failures to

15

investigate the alleged threat to Wagner by his cousin, or the possible role of the mystery man who picked up Dale Allbright somewhere in the vicinity of the crime, did not tend to show that further investigation of these matters in 1994 as opposed to 2011 would likely have produced anything helpful to [Hoover].

In *People v. Zapien* (1993) 4 Cal. 4th 929, 976, our Supreme Court upheld the trial court's ruling to admit evidence although the trial court gave an erroneous reason. The court noted: "'No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal. 3d 1, 19.)

We conclude that the trial court's finding of prejudice was error. However, the court properly denied [Hoover's] motion to dismiss.[FN15] "[A] proper ruling on the motion to dismiss, supported by substantial evidence, will not be reversed even though the trial court gave an incorrect reason for that ruling. [Citation.]" (*People v. Gilchrist* (1982) 133 Cal. App. 3d 38, 44.)

> FN15. To the extent [Hoover] was entitled to any remedy based on the delay in prosecution, the trial court's instruction that the jury could choose to hold the absence of certain evidence against the People was sufficient.

Since [Hoover] failed to show prejudice, we uphold the trial court's ruling without considering the prosecutor's justification for the delay. (*See Lowe*, *supra*, 40 Cal. 4th at p. 942; *Mirenda*, *supra*, 174 Cal. App. 4th at pp. 1327–1328.)

**2. Motion for Reconsideration**

[Hoover's] later argument for reconsideration based on evidence adduced at trial was similarly unpersuasive. Although he cited one failure of memory by a testifying officer, he failed to explain how that failure of memory tended to prove prejudice from the delay in prosecution. Similarly, [Hoover's] references to persons the victim contacted on the date of the crime that could not now be tracked down and theory of third party perpetrators was entirely speculative and undeveloped. Finally, the fact that Carvalho's alibi for [Hoover] could not be corroborated by evidence from her deceased parents was not proof of prejudice from delay, because there is no reason to presume that they would have corroborated the alibi or that they would have been credible had they done so. Therefore, none of [Hoover's] arguments justified the requested relief of dismissal.

*Hoover*, 2013 WL 3938506, at *6-7.

On federal habeas review, this Court's task is not to make an independent, *de novo* determination as to whether Hoover suffered actual prejudice by the 17-year delay. Rather, this

Court is to determine whether the state court's conclusion that Hoover did not suffer actual prejudice was objectively reasonable. *Williams*, 529 U.S. at 412-13. Although the length of the delay here is extreme and certainly troubling, based on a review of the thorough record developed by the trial court and described on direct appeal, this Court must conclude that the state court's determination was objectively reasonable. Hoover has not shown that the California courts' findings of fact were unreasonable, or that the factual and legal conclusion that Hoover did not suffer substantial prejudice contravened or unreasonably applied clearly established federal law. Accordingly, Hoover cannot show that the pre-indictment delay violated his due process rights, and he is not entitled to relief on Ground 1.

Hoover does not fare better with respect to his Sixth Amendment claim that he was constructively denied counsel due to the delay in prosecution. In support of his argument, Hoover cites *United States v. Cronic*, where the Supreme Court identified three ineffective-assistance-of-counsel circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. 648, 659-660 (1984). Such circumstances are present when (1) there is a complete denial of counsel; (2) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) counsel is called on to render assistance under circumstances where "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659-60; *see also Bell v. Cone*, 535 U.S. 685, 695-96 (2002). The absence of counsel, actual or constructive, must occur at a "critical stage" of trial. *Id.* at 659, n.25. But Hoover provides no support, much less clearly established authority from the United States Supreme Court, that establishes that a

period of investigative delay may constitute a "critical stage" of trial for which counsel is constitutionally required. In the absence of Supreme Court authority on this issue, the Court cannot say that the state courts' rejection of Hoover's claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Musladin*, 549 U.S. at 77 (brackets and internal quotation marks omitted). Hoover is therefore not entitled to relief on Ground 2 either.

## V. CONCLUSION AND ORDER

Hoover is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court issues a Certificate of Appealability with respect to both Grounds 1 and 2. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed

further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: February 23, 2018.

   /s/James K. Singleton, Jr.   
JAMES K. SINGLETON, JR.
Senior United States District Judge
